**TOSTRUD LAW GROUP, P.C.**
JON A. TOSTRUD
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 278-2600
Facsimile: (310) 278-2640
jtostrud@tostrudlaw.com

**GAINEY McKENNA & EGLESTON**
THOMAS J. MCKENNA
GREGORY M. EGLESTON
440 Park Avenue South, 5th Floor
New York, New York 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILTON SAMUELS, Derivatively on Behalf of NOVA LIFESTYLE, INC., | Case No.: 19-4216 |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| THANH H. LAM, MIN SU, BIN LIU, CHARLIE HUY LA, UNMESH PATEL, YUEN CHING HO, YA MING WONG, and JEFFEREY CHUANG, | |
| Defendants, | |
| -and- | |
| NOVA LIFESTYLE, INC. | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Wilton Samuels ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Nova Lifestyle, Inc. ("Nova" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Nova with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of Nova against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law that have occurred from December 3, 2015 through the present (the "Relevant Period") and have caused substantial harm to the Company.

2.     Nova is a designer and marketer of contemporary styled residential and commercial furniture. The Company's products are marketed through wholesale and retail channels as well as various online platforms worldwide.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

3. As more fully described herein, during the Relevant Period, the Director Defendants (defined below) made and/or caused Nova to make false and misleading statements claiming that it had signed a "strategic alliance agreement" with (China) Shanxi Wanqing Senior Care Service, Group ("Shanxi Wanqing") to operate as its exclusive supplier for furniture design and manufacturing, that Shanxi Wanqing planned to invest $460 million to build a major senior care center, and that this agreement and relationship was critical to increase its exposure in new markets, and generate significant long-term revenue opportunities for the Company.

4. Also, as more fully described herein, during the Relevant Period, the Director Defendants made and/or caused the Company to make false and misleading statements resulting in reported inflated customer sales in 2016 and 2017.

5. On December 21, 2018, Andri Capital published a report on *SeekingAlpha.com* which detailed its deep dive investigation into Shanxi Wanqing and its purported "strategic alliance agreement" with Nova. Andri Capital also reported on the results of its investigation into Nova's claims of sales to its "largest" customers finding that at least some of the companies had been dissolved or did not exist. Andri Capital also identified other concerns and red flags relating to Nova.

6. On this news, the price of Nova shares fell $0.31 per share or over 40% to close at $0.46 per share on December 21, 2018.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

7.     The misconduct of Nova and its officers and directors also has subjected the Company and/or its officers and directors to a securities class action and other litigation, including *Barney v. Nova Lifestyle, Inc., et al.*, Case No. 2:18-cv-10725 (C.D. CA) (the "Securities Class Action").

## JURSIDICTION AND VENUE

8.     Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 20(a) of the Exchange Act.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

9.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (a) the Company maintains its principal place of business in this District; (b) one or more of the defendants either resides in or maintains executive offices in this District; (c) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (d) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

11.   ***Plaintiff Wilton Samuels*** ("Plaintiff") is a current owner of Nova's stock and has held the stock during the time of the Director Defendants' continuous wrongful course of conduct alleged herein.   Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.

### Nominal Defendant

12.   ***Defendant Nova Lifestyle, Inc.*** ("Nova" or the "Company") is a designer and marketer of contemporary styled residential and commercial furniture formerly known as Stevens Resources, Inc.  Nova's products are marketed through wholesale and retail channels as well as various online platforms worldwide.  Nova was incorporated in Nevada and its principal executive offices are located at 6565 E. Washington Blvd., Commerce, California 90040. The Company's securities are traded on the NASDAQ under the ticker symbol "NVFY."

### Director Defendants

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

- 4 -

13.    **Defendant Thanh H. Lam** ("Lam") was appointed as Nova's President and a member of its Board of Directors ("Board") on June 30, 2011 and was elected as Chairperson of the Board on June 4, 2013.  Lam was appointed as Nova's Interim Chief Executive Officer on October 7, 2016 and as its Chief Executive Officer ("CEO") on April 10, 2017.  Between 2015 and 2018, Lam received approximately $562,458.00 in total compensation from Nova.

14.    On information and belief, Plaintiff alleges that in November 2016 and with the benefit of insider information, Lam sold 50,000 shares of Nova stock at a price of $2.95 per share and received approximately $147,500.00.  Lam was a co-founder of the Diamond Sofa brand and previously was the CEO of Diamond Bar in Commerce, California, a wholly owned subsidiary of the Company acquired in August 2011.  Lam has pioneered the Diamond Sofa brand since 1992.  Lam is also known as Tawny Lam.

15.    **Defendant Min Su** ("Su") has served as a member of Nova's Board since August 22, 2017 and has served as the Company's Corporate Secretary since November 2016.  Between 2016 and 2018, Su received approximately $314,189.00 in total compensation from Nova.  From 2012 to November 2016, Su served as the accounts payable coordinator of Diamond Bar Outdoors Inc., the wholly-owned subsidiary of the Company, and concurrently as its executive secretary.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

16.    **_Defendant Bin Liu_** ("Liu") has served as a member of Nova's Board since May 19, 2015.  At all relevant times, Liu has been chairman of Nova's Audit Committee, and a member of its Compensation Committee and Nominating and Governance Committee.   Between 2015 and 2018, Liu received approximately $321,663.00 in total compensation from Nova.

17.    **_Defendant Charlie Huy La_** ("La") has served as a member of Nova's Board since January 24, 2017.  Since on or about that date, La has been a member of Nova's Audit Committee, Compensation Committee, and Nominating and Governance Committee.   From 2017 to 2018, La received approximately $599,372.00 in total compensation from Nova.

18.    **_Defendant Umesh Patel_** ("Patel") has served as a member of Nova's Board since October 7, 2016.  Since on or about that date, Patel has been a member of Nova's Audit Committee, Compensation Committee, and Nominating and Governance Committee.   Between 2016 and 2018, Patel received approximately $99,231.00 in total compensation from Nova.

19.    On information and belief, Plaintiff alleges that with the benefit of insider information, on November 1, 2017, Patel sold 5001 shares of Nova stock at a price of $1.56 per share and on November 13, 2017.  Patel sold 9040 shares of Nova stock at a price of $2.56.  In total, Patel received approximately $30,950.00.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

20.    Defendants Lam, Su, Liu, La, and Patel are referred to herein as the "Director Defendants."

**Officers and Former Directors**

21.    **Defendant Yuen Ching Ho** ("Ho") was appointed as Nova's Chief Financial Officer ("CFO") on June 30, 2011 and served as a member of Nova's Board from May 28, 2013 through August 15, 2017.  He was one of the two founders of Nova Dongguan, Nova's wholly owned subsidiary, and has served as its CFO since its inception in 2003.  Plaintiff is informed and believes that Ho is also known as Sammy Ho.

22.    **Defendant Ya Ming Wong** ("Wong') was appointed as Nova's CEO on June 30, 2011 and served as a member of Nova's Board from June 30, 2011 through October 3, 2016.  Wong was one of the two founders of Nova Dongguan, Nova's wholly owned subsidiary, and has served as its CEO since its inception in 2003.

23.    **Defendant Jefferey Chuang** ("Chuang") was appointed as Nova's CFO on August 22, 2017 and continues to serve Nova in that capacity.

24.    Defendant Lam, Ho, Wong and Chuang are herein referred to collectively as the "Officer Defendants".

**Non-Party**

25.    **Michael Viotto** served as a member of Nova's Board from May 28, 2013 through January 27, 2017.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

26.     ***Ching Shing Yam*** served as a member of Nova's Board from May 28, 2013 through September 30, 2016.

27.     ***Peter Kam*** served as a member of Nova's Board from May 28, 2013 through November 1, 2016.

28.     ***Steven Qiang Liu*** served (and continues to serve) as Nova's Vice President since January 2, 2017.  Liu is the chief executive officer and founder of St. Joyal, a company engaged in business investment and development that was founded in 2007.   Collectively, Liu and St. Joyal are Nova's single largest shareholder.  In Nova's Form DEF 14A filed with the SEC on April 9, 2015, Nova describes its related party transaction with St. Joyal as:

> On January 1, 2011, Nova Furniture entered into the St. Joyal Shareholder Agreement with St. Joyal, an unrelated California corporation engaged in business investment and development. St. Joyal has introduced us from time to time in 2010 and 2011 to prospective customers through its business contacts with U.S. domestic furniture wholesalers and retailers. St. Joyal did not receive any commissions or compensation from Nova Furniture for these introductions. Pursuant to the St. Joyal Shareholder Agreement, St. Joyal agreed to pay $2.4 million to Nova Furniture by January 1, 2014, for 18.75% of the equity interest in Nova Furniture, of which St. Joyal had paid $1.65 million as of December 31, 2013 and $0.75 million remained outstanding. The parties agreed to extend the payment of the remaining balance until April 15, 2014, at which time the balance was paid in full.  The St. Joyal Shareholder Agreement also provides for St. Joyal to help us expand into the U.S. market by continuing to introduce us to prospective customers and acting as an advisor to us on sales and other business matters. The St. Joyal Shareholder Agreement provides for no compensation to St. Joyal, nor do we have any plans to compensate St. Joyal other than the

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

reimbursement of expenses, of which none have accrued as of December 31, 2014.

29.   In Nova's Form DEF 14A filed with the SEC on April 20, 2017 (the "2017 Proxy") it lists St. Joyal as owning 4,973,903 shares of common stock which was 18.4% of all outstanding shares.  In Nova's Form DEF 14A filed with the SEC on April 9, 2018 (the "2018 Proxy"), it does not list St. Joyal as a beneficial owner of any shares and instead lists Steven Qiang Liu as owning 10,065,306 shares of common stock which was 36.56% of all outstanding shares.  In Nova's Form DEF 14A filed with the SEC on April 26, 2019 (the "2019 Proxy"), it does not list St. Joyal as a beneficial owner of any shares and instead lists Steven Qiang Liu as owning 10,065,306 shares of common stock which was 36.21% of all outstanding shares.

30.   On information and belief, Plaintiff alleges that Nova and St. Joyal share the same business address in Commerce, CA.

## NOVA'S CORPORATE GOVERNANCE

31.   As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

32.   The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

**Code of Business Conduct and Ethics**

33.    Nova maintains a Code of Business Conduct and Ethics ("Code of Conduct") which states it was adopted by the Board of Directors on June 4th, 2013. As stated therein, the Code of Conduct applies to all of Nova's officers, directors, and employees.   Regarding Insider Trading, the Code of Conduct states "[t]he Company has a separate insider trading policy…".   No "separate insider trading policy" appears on Nova's website. Plaintiff was not able to locate any insider trading policy in Nova's filings with the SEC and based thereon alleges that Nova does not have or maintain an insider trading policy.   The Code of Conduct states in relevant part:

> Compliance with Laws, Rules and Regulations
>
> Obey the law, both in letter and in spirit, is the foundation on which our ethical standards are built. All employees must respect and obey the laws of the cities, states and countries in which we operate. Although not all employees are expected to know the details of these laws, it is important to know enough about them to determine when to seek advice from supervisors, managers or other appropriate personnel.
>
> * * *
>
> Insider Trading

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Employees who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of our business. All non-public information about the Company should be considered confidential information. To use non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical but also illegal. The Company has a separate insider trading policy which every officer, director and employee must read, understand and certify to having read and understood.

\* \* \*

Competition and Fair Dealing

We seek to outperform our competition fairly and honestly. Stealing proprietary information, possessing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is prohibited. Each officer, director and employee should respect the rights of and deal fairly with the Company's customers, suppliers, competitors and employees. ***No employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other intentional unfair-dealing practice***.

\* \* \*

Disclosure

The Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules. ***Each director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained***. Each director, officer and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel. ***Each***

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

*director, officer and employee who is involved in the Company's disclosure process must: (a) be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and (b) take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.*

\* \* \*

Record-Keeping

The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions…. All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform to both applicable legal requirements and to the Company's systems of accounting and internal controls.  Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable laws or regulations. Business records and communications often become public, and we should avoid exaggeration, derogatory remarks, guesswork or inappropriate characterizations of people and companies that can be misunderstood. This applies equally to e-mail, internal memos and formal reports. Records should always be retained or destroyed according to the Company's record retention policies. In accordance with these policies, in the event of litigation or governmental investigation please consultant your supervisor. [Emphasis added]

34.    Nova maintains an Audit Committee Charter, which is undated.  As stated in its charter, the purpose of the Audit Committee is to assist Nova's Board of Directors ". . . in its oversight of accounting, financial reporting and disclosure processes and adequacy of systems of disclosure and internal controls . . . ."  The Audit Committee Charter provides in relevant part:

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Controls within the Company; Related Party Transactions

* * *

To annually review major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies.

To assist the Board and the Company in interpreting and applying the Company's general Code of Business Conduct and Ethics and other issues related to Company and Employee Governance and Ethics.

To receive quarterly a report from the Company's chief executive and chief financial officer describing:

All significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize, and report financial data; and

Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

* * *

Review of Risk Management; Compliance

To discuss guidelines and policies to govern risk assessment and risk management.

To discuss the Company's major risk exposures and the steps Company management has taken to monitor and control such exposures.

35. Nova also maintains a Nominating and Corporate Governance Committee Charter ("Corporate Governance Charter"), which is undated. As stated therein, part of the purpose of the Corporate Governance Committee is to develop

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

and maintain the Company's corporate governance policies and any related matters required by the federal securities laws.  Notwithstanding the express language of this charter, no Corporate Governance Guidelines appear on Nova's website. Plaintiff was not able to locate any Corporate Governance Guidelines in Nova's filings with the SEC and based thereon alleges that Nova does not have or maintain Corporate Governance Guidelines.  Nova's Corporate Governance Charter states in relevant part:

> **Duties and Responsibilities**. The Committee has the following duties and responsibilities:
>
> * * *
>
> **Corporate Governance Guidelines**. To maintain and update, as appropriate and with Board approval the Company's Corporate Governance Guidelines.
>
> * * *
>
> **Interpretation and Application of Laws and Guidelines**. To educate the Board and the Company on applicable governance laws and regulations and assist the Board and the Company in interpreting and applying the Company's Corporate Governance Guidelines and other issues related to Board governance.
>
> * * *
>
> **Director Independence**. To develop and recommend to the Board standards for Director independence.
>
> * * *
>
> **Code Of Business Conduct And Ethics**. To monitor compliance with the Company's Code Of Business Conduct And Ethics (the

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"Code"), to investigate any alleged breach or violation of the Code and to enforce the provisions of the Code.

## DUTIES OF THE DIRECTOR DEFENDANTS

36.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

37.    Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

38.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

duties, the officers and directors of the Company were required to, among other things:

> (a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;
>
> (b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;
>
> (c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;
>
> (d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;
>
> (e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

39.    Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

40.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business opportunities, results, and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## SUBSTANTIVE ALLEGATIONS

**Background**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

41.   In its December 2016 Investor Presentation, Nova describes its formation as follows: "Nova LifeStyle was formed through the combination of Nova, which was founded in 1993 by Jeffrey Wong (CEO) and Sammy Ho (CFO) in China, and Diamond Sofa, which was founded in 1992 by Tawny Lam (Interim CEO/President) in the U.S."

42.   In its Form 10-K filed with the SEC on April 1, 2019 (the 2019 10-K") Nova describes its business as:

> Nova LifeStyle, Inc. ("Nova LifeStyle" or the "Company") is a U.S.-based innovative designer and marketer of contemporary styled residential and commercial furniture formerly known as Stevens Resources, Inc., we were incorporated in the State of Nevada on September 9, 2009. The Company's products are marketed through wholesale and retail channels as well as various online platforms worldwide.

> Nova LifeStyle's family of brands includes Diamond Sofa (www.diamondsofa.com) and Bright Swallow.

> Our business strength lies in our abilities to quickly adapt to changing marker demand and stay ahead of the latest trends in modern furniture designs. Our customers principally consist of designers, distributors and retailers…

> We generate the majority of our sales as a branding and marketing company with vertically integrated third-party manufacturing capabilities for global furniture distributors and large national retailers….

43.   In its 2019 10-K, Nova also states that "[w]e are a U.S. holding company that operates through several wholly-owned subsidiaries" and includes its organizational chart:

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1
2
3
4
5
6
7
8



9      44.    On September 23, 2016, Nova filed a Form 8-K with the SEC

10   announcing that effective September 22, 2016, it terminated the services of its

11

12   independent auditor, Crowe Horwath (HK) CPA Limited ("CHHK") and retained

13   the services of DCAW (CPA) Limited ("DCAW").   Nova represented that this

14
     change was due to CHHK's decision to terminate its audit and assurances services to
15

16   public companies' subject to the statutes and regulations of the United States.  Nova

17   did not (and has not) identified the individual at CHHK who was personally

18

19   responsible for the accounting and auditing services at CHHK, but added in its

20   announcement that "[t]he director formerly responsible for the Company's account

21

22   at Crowe Horwath (HK) CPA Limited will join the Company's new audit firm,

23   DCAW (CPA) Limited, and will be the director responsible for the Company's

24
     account at DCAW."
25

26      45.    DCAW (now known as Centurion ZD CPA Limited) exists as the result

27   of a merger between AWC (CPA) Limited ("AWC"), formerly known as Albert

28

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Wong & Company, and Dominic K.F. Chan & Co. ("Chan"). On May 19, 2016, the Public Company Accounting Oversight Board ("PCAOB") revoked the PCAOB registration of AWC.[1]

46. Discussing the AWC/Chan merger, *chinaaccountingblog.com* stated:

> Here is a stunt that should not work. As the PCAOB disciplinary proceeding came to a conclusion, AWC merged with effect from April 30, 2016 with Dominic K.F. Chan & Co to form DCAW, a firm that filed to succeed to the PCAOB registration of Dominic K.F. Chan & Co. That seems a clever way to circumvent the imminent ban of AWC….

47. On December 30, 2016, Wong filed a Form SC 13D/A with the SEC which is described as "Amendment No. 1 to Schedule 13D ("Amendment No. 1") amends and supplements the statement on Schedule 13D filed on July 6, 2011 (the "Initial Statement"), with respect to shares of common stock, par value $0.001 per share, of Nova Lifestyle, Inc. (the "Issuer"), a Nevada corporation." As stated in this filing, Wong sold his shares to St. Joyal:

> The Reporting Person entered into a Stock Purchase Agreement dated December 28, 2016 (the "Stock Purchase Agreement"), by and between the Reporting Person and St. Joyal, to sell 4,973,903 shares of the Issuer's common stock (the "Stock") to St. Joyal. Pursuant to the Stock Purchase Agreement, St. Joyal acquired the stock at a purchase price equal to the average closing price of the Issuer's common stock during the seven trading days preceding Closing Date (as defined therein), or $2.11 per share. The Stock Purchase Agreement contains customary representations, warranties and

---

[1] *See* May 19, 2016 PCAOB press release at https://pcaobus.org/News/Releases/Pages/PCAOB-sanctions-hong-kong-audit-firm-new-york-affiliate-four-individuals.aspx

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

covenants by the Reporting Person and St. Joyal.  Each of St. Joyal on the one hand, and the Reporting Person on the other hand, agreed to indemnify each other for material inaccuracies, breaches of representations and warranties, and material breaches of the Stock Purchase Agreement.

48.    On that same date, December 30, 2016, Steven Liu filed a Form SC 13D/A with the SEC which is also described as "Amendment No. 1 to Schedule 13D ("Amendment No. 1") amends and supplements the statement on Schedule 13D filed on July 6, 2011 (the "Initial Statement"), with respect to shares of the common stock, par value $0.001 per share (the "Common Stock"), of Nova Lifestyle, Inc., a Nevada corporation (the "Issuer")."  This filing identifies the dates and number shares sold and purchased by Steven Liu in private transactions.  Under "Item 5. Interest in Securities of the Issuer", this filing states in relevant part:

Steven Liu, indirectly through his ownership of 100.0% of the equity interest of St. Joyal, and directly, has beneficial ownership of an aggregate of 5,818,903 shares of Common Stock of the Issuer.  Steven Liu's beneficial ownership in the Common Stock represented approximately 21.86% of the outstanding Common Stock that were deemed to be outstanding for purposes of calculating the beneficial ownership of Steven Liu under Section 13(d) of the Act.

St. Joyal has direct beneficial ownership of an aggregate of 4,973,903 shares of Common Stock of the Issuer. St. Joyal's beneficial ownership in the Common Stock represented approximately 18.68% of the outstanding Common Stock that were deemed to be outstanding for purposes of calculating the beneficial ownership of St. Joyal under Section 13(d) of the Act.

49.    As stated in Nova's Form 8-K filed with the SEC on June 22, 2017, on or about June 19, 2017, Defendant Ho sold 4,156,403 shares of Nova's common

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

stock to Mr. Steven Liu resulting with him owning approximately 37% of Nova's issued and outstanding common stock.  This Form 8-K states in relevant part:

> On June 19, 2017, Mr. Yuen Ching Ho, chief financial officer and a director of Nova Lifestyle, Inc. (the "Company"), sold to Mr. Steven Liu 4,156,403 shares of the Company's common stock in a private transaction (the "Share Purchase") for an aggregate purchase price of $5,860,528 (the "Purchase Price").  Mr. Liu paid the purchase price using personal funds.  Prior to the Share Purchase, Mr. Liu was the direct and indirect beneficial owner of 5,818,903 shares of the Company's common stock in his personal capacity and as the sole shareholder of St. Joyal. Following the Share Purchase, Mr. Liu is the beneficial owner, directly and indirectly, of 9,975,306 shares, or 37.0%, of the Company's issued and outstanding common stock. Prior to the Share Purchase, no shareholder or beneficial owner exercised control over the Company.  There is no arrangement known to the Company the operation of which may at a subsequent date result in a change of control of the Company.

50.    On December 12, 2017 Nova filed a Form 8-K with the SEC and attaching its December 11, 2017 announcing Nova's $5 million share repurchase program.   The press release stated in relevant part:

> LOS ANGELES, December 11, 2017 (GLOBE NEWSWIRE) -- Nova LifeStyle, Inc. (NVFY) ("Nova LifeStyle" or the "Company"), a California-based innovative designer and global distributor of modern lifestyle household consumer products, today announced that its Board of Directors has approved a 10b-18 share buyback program to purchase up to $5 million of the Company's common stock in transactions conducted through a broker or dealer in compliance with Rule 10b-18 promulgated under the Exchange Act. The duration of the program will be one year.

> "As Nova LifeStyle continues to experience record profit growth, supported by a strong balance sheet and operating cash flow, the Company is pleased to announce it's first buyback program that enables us to return value to shareholders, while at the same time

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

continuing to invest in opportunities that will further strengthen our robust growth which is anticipated to continue well into 2018," said Tawny Lam, CEO of Nova LifeStyle. "The Board of Directors believes that the company's shares are an attractive investment opportunity and repurchasing stock is an important part of our capital allocation strategy."

The Company has recently provided fourth quarter earnings guidance and anticipates record earnings growth in 2018.

The share buyback program will be funded from the Company's cash and future cash provided by operating activities.

The buyback program will depend on a number of factors, including, but not limited to, market conditions (such as price, trading volume) and the company's working capital requirements, general business conditions and other factors. The share buyback program has a time limit of one year and maybe suspended, modified for periods and discontinued upon approval by the Board of Directors in compliance with applicable securities laws and regulations.

51.    As stated in Nova's Form 8-K filed with the SEC on February 28, 2018, on February 23, 2018, Nova's Board amended its by-laws changing the shareholder quorum requirements which were reduced from a majority to one-third. This change effectively gave Steven Liu control of shareholder meetings.   This Form 8-K states in relevant part:

On February 23, 2018, the board of directors (the "Board") of Nova Lifestyle, Inc., a Nevada corporation (the "Company"), approved an amendment to the Company's amended and restated bylaws to reduce the quorum required for meetings of the Company's shareholders from a majority to one-third of the stock of the Company issued, outstanding and entitled to vote at any such meetings, present in person or represented by proxy. The amendment became effective immediately.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## MATERIALLY FALSE AND MISLEADING STATEMENTS

52.     On December 3, 2015, Nova issued a press release claiming that it had signed a "strategic alliance agreement" with (China) Shanxi Wanqing Senior Care Service, Group ("Shanxi Wanqing") to operate as its exclusive supplier for furniture design and manufacturing.  Nova asserted that Shanxi Wanqing planned to invest $460 million to build a senior care center in Luoyang, Henan province in China and consisting of housing, entertainment, and medical facilities spread over 329.5 acres. Nova's press release states in relevant part:

> **LOS ANGELES, CA – December 3, 2015 -- Nova LifeStyle, Inc. (NASDAQ: NVFY) ("Nova LifeStyle" or the "Company")**, a U.S. based fast-growing, innovative designer, manufacturer and distributor of modern LifeStyle furniture, today announced that the Company has signed a strategic alliance agreement with (China) Shanxi Wanqing Senior Care Service, Group ("Shanxi Wanqing"), a senior care service, senior care home and hotel development company, to operate as its exclusive supplier for furniture design and manufacturing.
>
> Shanxi Wanqing plans to invest a total amount of 3.0 billion RMB (USD $460 M) to build a major senior care center in Luoyang, Henan province in China, and Nova LifeStyle will operate as the lead designer and manufacturer for all furnishings in the complex. Shanxi Wanqing is managing the project in conjunction with Luoyang Glass Company Limited ("Luoyang Glass"), a well-regarded, publicly traded state-owned enterprise that listed in both Shanghai and Hong Kong Exchange that manufactures and sells sheet glass in over 80 countries throughout the world.
>
> The center will operate as a modern, state-of-the-art senior care hub in the fifth largest provincial economy of China, comprising of housing, entertainment, and medical facilities spread over 329.5 acres. Construction at the property has already commenced, which consists of individual homes, and the rest of the project will continue

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

throughout 2016. The companies will also collaborate on marketing initiatives, customer service, and product promotion in China in the coming year. Nova LifeStyle is the first American Brand furnishing solution provider to be included on a construction project of this scale in China.

**Management Commentary**

Mr. Jeffrey Wong, CEO of Nova LifeStyle, stated, "We are very pleased to sign an exclusive agreement to partner with Shanxi Wanqing and work with a well-regarded company such as Luoyang Glass, and support their plans for a modernized health care center in China. Partnerships with well-capitalized companies such as Shanxi Wanqing and Luoyang Glass are critical to increase our exposure in new markets, such as health care, and generate significant long-term revenue opportunities for the Company. With our ability to secure such agreements, we can better align ourselves with the type of large-scale projects that will re-shape modern China in the decades to come."

Ms. Shengming Wu, CEO of Shanxi Wanqing, commented, "We are pleased to partner with Nova LifeStyle, as we believe that both companies share the same vision of providing quality lifestyle solutions for China's elderly. According to the China Research Center on Aging, nearly 15% of the country's population, over 200 million people, are 60 or older and the Chinese government remains at the forefront of modernizing health care options within China. We look forward to collaborating with Nova LifeStyle in the years to come."

**About Shanxi Wanqing Senior Care Service, Group**

To learn more about Shanxi Wanqing, please visit its website at http://www.wanqing-group.com/.

**About Nova LifeStyle**

Nova LifeStyle, Inc., a NASDAQ Global Markets Exchange listed company headquartered in California, is a fast growing, innovative designer, manufacturer and distributor of modern LifeStyle furniture; primarily sofas, dining rooms, cabinets, office furniture and related

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

components, bedrooms, and various accessories in matching collections. Nova's products are made in the US, Europe, and Asia and include LifeStyle brands such as Diamond Sofa, Colorful World, Giorgio Mobili, Nova QwiK, and Bright Swallow International. Nova's products feature urban contemporary styles that integrate comfort and functionality incorporating upscale luxury designs appealing to LifeStyle-conscious middle and upper middle-income consumers in the U.S., China, Europe, and elsewhere in the world. To learn more about Nova LifeStyle, Inc., please visit our website at www.NovaLifeStyle.com.

53.    On this news, Nova saw a steady rise in its stock price from $2.04 per share at its opening on December 3, 2015 to close at $2.12 per share on December 8, 2015.

54.    On March 28, 2016, Nova filed a Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K") with the SEC.  The 2015 10-K does not mention Shanxi Wanqing or the "strategic alliance agreement".

55.    In a December 2016 investor presentation, Nova touted its milestones and key events from 2014 to the present.  One of Nova's listed purported milestones was its agreement with Shanxi Wanqing:

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**



56.    On April 14, 2017, Nova filed a Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K") with the SEC.  The 2016 10-K was signed by Defendant Lam and Mr. Ho.   The 2016 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Lam and Ho attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

57.    Regarding Nova's customers and sales, the 2016 10-K stated in relevant part:

**Customers**

Our target end customer is the middle and upper middle-income consumer of residential furniture. In the U.S. and international markets, our sales principally are to furniture distributors and retailers who in turn offer our products under their own brands or under our Diamond Sofa brand. ***Our largest customers in 2016 were Shanxi Wanqing Senior Care Service, Group and Actona Company A/S, a global furniture distributor, which accounted for 10.8% and 9.7% of our total sales in 2016, respectively.*** Our two largest customers in 2015 were Actona Company A/S and Encore Sofa Inc., which in total accounted for 11.8% of our sales in 2015. No other individual customer accounted for greater than 10% of our sales in 2016 or 2015. We plan to increase direct sales to retailers and chain stores worldwide as we continue to diversify our customer base from global furniture distributors. [Emphasis added].

58.    On March 29, 2018, Nova filed a Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K") with the SEC. The 2017 10-K was signed by Defendant Lam and Mr. Chuang. The 2017 10-K contained signed SOX certifications by Defendant Lam and Chuang attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

59.    Regarding Nova's customers and sales, the 2017 10-K stated in relevant part:

**Customers**

Our target end customer is the middle and upper middle-income consumer of residential furniture. In the U.S. and international markets, our sales principally are to furniture distributors and retailers who in turn offer our products under their own brands or under our Diamond Sofa brand. ***Our largest customers in 2017 were Merlino Lewis LLP, Shanxi Wanqing Senior Care Service, Group and Home***

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

*Centre LLC, which accounted for 24.3%, 13.7% and 11.5% of our total sales in 2017, respectively. Our two largest customers in 2016 were Shanxi Wanqing Senior Care Service, Group and Actona Company A/S, a global furniture distributor, which accounted for 10.8% and 9.7% of our total sales in 2016, respectively*. No other individual customer accounted for greater than 10% of our sales in 2017 or 2016. We plan to increase direct sales to retailers and chain stores worldwide as we continue to diversify our customer base from global furniture distributors.  [Emphasis added].

60.    The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to the Director Defendants or recklessly disregarded by them. Specifically, the Director Defendants made false and/or misleading statements and/or failed to disclose that: (1) Nova's purported "strategic alliance" with Shanxi Wanqing to operate as lead designer and manufacturer for all furnishings in Shanxi Wanqing's planned $460 million senior care center in China; (2) Nova inflated its reported sales in 2016 and 2017 with Shanxi Wanqing, Merlino Lewis LLP, and other companies; (3) Nova failed to maintain effective internal controls; and (3) as a result, the Company's public statements were materially false and misleading at all relevant times.

## THE TRUTH EMERGES

61.    On December 21, 2018, *Seeking Alpha* published a report by Andri Capital regarding Nova.  In the report, Andri Capital stated that it found "…multiple

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

irregularities that suggest fictitious/inflated sales", that Nova booked over $50 million in sales to "…companies that either have been dissolved or do not exist…", and in addition to other matters, raised concerns about Nova's auditors and other red flags.

62.    Regarding its concerns and investigation into alleged fictitious/inflated sales, Andri Capital focused on the two (2) customers Nova identified in its 2017 10-K as its largest; Merlino Lewis LLP and Shanxi Wanqing Senior Care Service, Group (which is also allegedly a party to Nova's "strategic alliance agreement). Regarding fictitious/inflated sales, the Andri Capital report stated in relevant part:

**Suspicious Activity: Fictitious/Inflated Sales**

In its 2017 annual report Nova LifeStyle stated:

*"Our largest customers in 2017 were Merlino Lewis LLP, Shanxi Wanqing Senior Care Service, Group and Home Centre LLC, which accounted for 24.3%, 13.7% and 11.5% of our total sales in 2017, respectively. Our two largest customers in 2016 were Shanxi Wanqing Senior Care Service, Group and Actona Company A/S, a global furniture distributor, which accounted for 10.8% and 9.7% of our total sales in 2016, respectively."*

Looking beyond the numbers we discovered the irregularities:

**Merlino Lewis LLP**

This company appears to have been dissolved in 2013 (Source: The Gazette - UK's official public record of statutory notices. (A simple Google Search for "Merlino Lewis LLP" also quickly reveals the above fact.). Therefore, it couldn't possibly have been a customer of Nova LifeStyle in 2017 - four years later after being liquidated and closed down.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

This company supposedly accounted for 24.3% of NVFY's total sales in 2017, or approximately $25.9 million (24.3% of $106,494,132 total sales). (Source: Annual report 2017)

We contacted Nova Lifestyle regarding the appearance that Merlino-Lewis LLP was dissolved during periods when Nova Lifestyle claimed sales to them, but did not receive a response.

**Shanxi Wanqing Senior Care Service, Group**

On December 3, 2015 NVFY announced that it had signed a strategic alliance agreement with Shanxi Wanqing Senior Care Service, Group to operate as its exclusive supplier for furniture design and manufacturing.  According to the press release:

> *"Shanxi Wanqing plans to invest a total amount of 3.0 billion RMB (USD $460 Million) to build a major senior care center in Luoyang Henan province in China, and Nova LifeStyle will operate as the lead designer and manufacturer for all furnishings in the complex."*

We have performed a search for this company in China with no results, i.e. no company by this name (or a similar one, in English or Chinese) seems to exist. Its supposed website is also not functional (wanqinggroup. com). (Source: State Administration for Industry and Commerce of the People's Republic of China)

However, we still found a company by this exact name incorporated in Nevada, USA. But it was registered on August 26, 2016 - nearly one year later after the announcement - and looks like an empty shell company, with the same person (Benedict Lo) serving as president, director, treasurer and secretary, and the business license likely expired on August 31, 2017. (Source)

One must ask, why would a private Chinese-based company, operating senior care centers in China, be incorporated in Nevada, USA? Also, the press release states that "construction at the property has already commenced", so the company must have existed before the announcement was made in 2015. However, the (Nevada-based)

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

company was incorporated in 2016 - a year later, and making no sense at all.

We also looked into the supposed CEO of the company, Ms. Shengming Wu. While it's true that she's involved with nursing homes and various other activities (source), we did not once find any interview or coverage about her mentioning the building of a major senior care center in Luoyang, Henan. She is never quoted as the "CEO of Shanxi Wanqing". Also, she lives in Xi'An which is the capital of Shaanxi (note two a's), so one would expect her company name to rather be a reference to Shaanxi instead of another neighboring Chinese province called Shanxi (her living there also goes to show that the Nevada-incorporated company is highly suspicious). Still we were easily able to find information about her other companies, both in coverage about her and in the Chinese registry (e.g. Yangling Hongyang Fruit Industry Technology Development Co., Ltd., or Wu Mama Xing Nong Technology Development Co., Ltd. (source)). Due to the fact that Ms. Shengming Wu is actually involved with senior care the matter becomes a little more complicated and cumbersome, because it seemingly lends truth to NVFY's announcement.

Seeing how big the senior care center was supposed to be, and knowing that Ms. Shengming Wu's mission revolves around nursing homes and elderly care, this should have been her crown jewel - yet nothing is ever mentioned of this project, not in 2015, 2016 or any year later. We only found information about her contracting land in the small district of Yangling, near Xi'An (not in Luoyang, Henan) to build an old-age apartment there within two to three years for 60 people - hardly a $460 million project (this was published just one month before NVFY's press release). There was also a video interview earlier this year (2018) where she at one point says that it is her dream to "build a model nursing home" (thereby surely implying that she has not been involved with building anything of such scale as the supposed major senior care center that was so vividly described in NVFY's press release).

The truth of the matter is that in 2010 Ms. Shengming Wu was actually approached by an owner of an elderly-care home in Xi'An to become its managing director, not a CEO of a "Senior Care Service

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Group". And according to all our sources, and as is generally described below, this is where she has been ever since. In other words, Ms. Shengming Wu simply manages a small elderly care home in Xi'An.

> *"In 2010, the owner of Yuhua Senior Apartment learned about Wu Shengming from TV and online, and invited her to manage this old apartment. At that time, she also operated her own company in Yangling Agricultural Science City. After being invited, she handed over the company to others and went to Xi'an alone.*

> *[At] Yuhua Senior Apartment in the intersection of Xi'an North Second Ring Road and Mingguang Road, the reporter saw Wu Shengming, who is known as "Mu Wu". She is the manager of this elderly apartment. Wu Shengming does not live in an elderly apartment, but rents a unit in the neighborhood opposite the apartment. Room, for one person living alone. "I go to the office at 7:20 every morning and work until 6 or 7 in the evening."*

> *"In the past few years, I have been with the old people most of the time, so I can accumulate more management experience." Wu Shengming told reporters that the reason why she [took on] the management of this apartment  is  that  she  wants  to  run  a  nursing  home  in  the future."* (Source, Note: This was published in November, 2015 - right before NVFY's press release  - and clearly  indicates that she is most certainly  not  a CEO  of  a  company  already  building  a  $460  million nursing home complex in another part of the country.)

And further, in an interview published one year later on December 26, 2016 she is quoted as "the manager of the nursing home". She also states clearly that she has entrusted others to run her own companies while she manages a nursing home of 80 elderly people in Xi'An (Yuhua senior apartment home) and:

> *"I am just earning a salary.  I still have a distance from a charity nursing home. It is estimated that it will take about three years." She said that the reason why she took over this*

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

*small-scale nursing home is that she wants to accumulate experience. "I will open my own nursing home in the future."*

*"What I am doing now is mainly grassroots work." This nursing home is very small and the things are fine and complicated. She can only manage with the mentality of learning and spends most of her time in contact with the elderly.*

*"[In large pension apartment centers] the top leaders only need to take care of the overall situation. But for small pension apartments, which plug is broken today, which tap tomorrow? Broken [items], security issues, electricity problems [...], I have to personally help."*

This is obviously a far cry from being the CEO of a multimillion dollar senior-care and hotel-development company that at the time had supposedly already commenced construction of a massive $460 million major care center with housing, entertainment, and medical facilities in Luoyang, Henan while partnering with a large, state-owned entity. And note, the above statement and interview was published one year later after the announcement by Nova LifeStyle. That is, even a year after NVFY announced the project she held the title "manager of a small- scale nursing home" in Xi'An - clearly describing the daily activities of a caretaker in an elderly-care apartment building - and obviously with no mention of any involvement with major developments in Luoyang, Henan, or relations to the state-owned Luoyang Glass.

So, at the time of Nova LifeStyle's press release Ms. Shengming Wu was managing a small apartment home for elderly in Xi'An, while dreaming of running her own nursing home in the future - not being the CEO of a large senior-care and hotel-development company already building a major care center in Luoyang, Henan in cooperation with a giant state-owned enterprise.

In regards to the cooperation with the publicly-traded, state-owned glass manufacturer Luoyang Glass: We read through all the firm's quarterly and annual reports since 2014, and not once was anything mentioned about Shanxi Wanqing or a senior care center project.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Multiple searches about any relations between this project and Luoyang Glass further revealed nothing.  Considering the supposedly large scale of the project (3 billion RMB or $460 million), it is simply strange that not a single comment can be found about it anywhere outside of the press release by Nova LifeStyle.

All in all, we found no company registered in China by the name "Shanxi Wanqing Senior Care Service, Group", no evidence of any links to Luoyang Glass, and no affiliations with Ms. Shengming Wu (who at the time of the announcement was a managing director of a single elderly home, dreaming of running her own small nursing home in the future in Xi'An - not a CEO of a multimillion dollar senior-care and hotel-development company already constructing a gigantic complex in Luoyang, Henan).

Based on the above, the statement by Nova LifeStyle has no support to be true. A few months before the press release shares of Luoyang Glass shot through the roof - going from 5 CNY in early 2014 to 45 CNY in October, 2015. The life story of Shengming Wu was also quite prominently featured in China. At the very least this Shanxi Wanqing Senior Care Service, Group is a significant irregularity, and in worst case scenario at most a complete fabrication or severe distortion of the truth.

Shanxi Wanqing Senior Care Service, Group supposedly accounted for 13.7% of NVFY's total sales in 2017, or approximately $14.6 million (13.7% of $106,494,132 total sales), and 10.8% of total sales in 2016, or approximately $10 million (10.8% of $92,648,195 total sales). That's $24.6 million in total for 2016 and 2017. (Source: Annual report 2017)

We contacted Nova Lifestyle regarding Shanxi Wanqing Senior Care Service, Group, but did not receive a response.

63.    Regarding its concerns about Nova's auditors, Andri Capital stated:

**Questionable auditors**: Centurion ZD CPA has been NVFY's auditor since 2016. It has audited many small, Chinese companies (often established through reverse mergers) that have listed (and delisted) in the US public and over-the-counter markets (see filings by Centurion

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

ZD CPA). Centurion ZD was formed in April 2016 by a merger of two independent CPA firms, Dominic K.F. Chan and AWC Limited (previously Albert Wong & Company; Albert Wong is now banned from being an associated person of a registered public accounting firm). And, in November 2017, there was a disciplinary case that involved Centurion ZD

64.    Other concerns and red flags raised by Andri Capital in its report include:

(a)    Nova's alleged sales to other companies (Actona Company A/S and High Fashion Home – listed as two of its largest customers in certain fiscal years);

(b)    Shareholder concerns - The Company has one significant (principal) shareholder, Steven Qing Liu, with 36% shareholding;

(c)    Diamond Bar – "[Nova] acquired Diamond Bar in 2011 for just $450 thousand (Source: Annual Report 2011). Now in 2018 Diamond Bar supposedly has net worth of at least $20 million (according to covenant requirements, *see* our earlier article). This is nearly 50-fold increase in just seven years";

(d)    Accounts Receivable – "According to the financials, the Company has made most of its sales on credit while taking over 160 days to collect outstanding sales (source). This has led the receivables account to balloon to approximately 67% of assets in 2017 (source). High level of accounts receivable is generally a cause for cash-flow

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

concerns but it can also be an indication of fictitious or inflated sales…."

65.    On this news, the price of Nova shares fell $0.31 per share or over 40% to close at $0.46 per share on December 21, 2018.

66.    On January 22, 2019 Nova filed a Form 8-K with the SEC disclosing that it had been delisted by NASDAQ.  The Form 8-K states in relevant part:

> ***On January 18, 2019, Nova LifeStyle, Inc. (the "Company") received written notice from the Nasdaq Stock Market ("Nasdaq") stating that, because the closing bid price for the Company's common stock listed on Nasdaq was below $1.00 for 30 consecutive trading days, the Company no longer meets the minimum bid price requirement for continued listing on Nasdaq*** under Nasdaq Marketplace Rule 5450(a)(1), which requires a minimum bid price of $1.00 per share (the "Minimum Bid Price Requirement").

> The notification has no immediate effect on the listing of the Company's common stock. In accordance with Nasdaq Marketplace Rule 5810(c)(3)(A), the Company has a period of 180 calendar days from the date of notification, until July 17, 2019 (the "Compliance Period"), to regain compliance with the Minimum Bid Price Requirement. If at any time before the expiration of the Compliance Period the bid price of the Company's common stock closes at or above $1.00 per share for a minimum of 10 consecutive business days, Nasdaq will provide written notification that the Company has achieved compliance with the Minimum Bid Price Requirement. If the Company does not regain compliance by the end of the Compliance Period, Nasdaq may provide written notification to the Company that the Company's common stock will be delisted. At that time, the Company may appeal Nasdaq's delisting determination to a Nasdaq Listing Hearings Panel. Alternatively, the Company may be eligible for an additional 180 day grace period if it satisfies all of the requirements, other than the minimum bid price requirement, for listing on The Nasdaq Capital Market set forth in Nasdaq Listing Rule 5505.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

The Company intends to continue actively monitoring the bid price for its common stock between now and the expiration of the Compliance Period and will consider available options to resolve the deficiency and regain compliance with the Minimum Bid Price Requirement. [Emphasis added].

67.    On March 29, 2019, Nova filed a Form 8-K with the SEC which attached its March 29, 2019 press release responding to the Andri Capital report. Nova's March 29, 2019 press release states in relevant part:

LOS ANGELES, March 29, 2019 (GLOBE NEWSWIRE) -- Nova LifeStyle, Inc. (NASDAQ: NVFY) today announced the results of special procedures performed by the Company's Auditors at the direction of the Audit Committee.  The special procedures revealed no evidence of fictitious sales or of fictitious customers, and definitively disprove the malicious assertions set forth in Andri Capital's self-styled research report regarding the Company (the "Andri Report") published by Seeking Alpha on December 21, 2018.

On January 2, 2019, the Company announced that it had engaged its independent auditors to perform special procedures following the publication of the Andri Report.  The Andri Report contains a "Sell" recommendation, and purports to present evidence that a substantial portion of the Company's sales made to four of the Company's largest customers during the relevant past were not legitimate, and further posits that, as a consequence of such sales, the Company's operating results have been substantially overstated.  One month earlier Andri Capital published a report on *Seeking Alpha* that concluded that the Company's common stock was significantly undervalued.  Within the month preceding the Andri Report and before Andri Capital published the reversal in its advice that the stock was substantially undervalued, Andri Capital accumulated a large short position which Andri Capital disclosed in its December 21, 2018 Report.  Following the publication of the Andri Report, the market price of the Company's common stock suffered a rapid decline, and a putative class action complaint, largely parroting the assertions set forth in the Andri Report, followed.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

The Audit Committee acted promptly to address the concerns raised in the Andri Report, to ensure the integrity of the 2018 audit, and to rebuild the market confidence that was damaged by the issuance of the Andri Report.   The Audit Committee engaged the Company's auditors to perform special procedures to confirm the reported sales. The special procedures included the examination and testing of all customer purchase orders, packing lists, bills of lading, sales invoices, vouchers, and related documents, for the four customers targeted in the Andri Report for years 2015, 2016, 2017 and 2018.   Those procedures included, among others, 100% sampling of all transactions between the Company and the subject customers, the receipt of written confirmations from each of the subject customers of all sales transactions to that customer, in-person interviews of senior officials of three of the four subject customers1, and independent searches verifying the existence of the subject customers.   The special procedures have been performed, and the results have been communicated to the Audit Committee.   The Auditor performed the special procedures with respect to a total of 2,222 sales transactions between the Company and the subject customers.   **The Company's independent auditor has reported to the Audit Committee that with respect to the four subject customers the special procedures resulted in no evidence of fictitious sales or of fictitious customers**.

Senior officials of the customers during in-person interviews provided clarity regarding the legal entities (related to the customers) that were involved in the sales transactions with the Company.   With respect to each of Merlino group of companies and Shanxi Wanqing, while the Company's public reporting of sales to the specific customer entities did not state the accurate names of those entities, the customer officials confirmed that the sales were made to entities associated with those two respective groups of companies. The Company's customer, High Fashion Home, is a furniture distributor, and not the furniture store suggested in the Andri Report.

Finally, the Company has discovered that there was a computational error in the narrative portion of the Company's 2016 Annual Report on Form 10-K (the "2016 Annual Report").   The Company 2015 and 2016 financial statements included in the 2016 Annual Report were unaffected.   While the Company believes the error was immaterial, the Company is disclosing the error in the interest of transparency.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

The 2016 Annual Report (page 5) disclosed that "Our two largest customers in 2015…. accounted for 11.8% of our sales in 2015."  It should have disclosed that "Our two largest customers in 2015 in total accounted for 16.3% of our sales from continuing operations."

The audit of the Company's 2018 financial statements is ongoing, and the Company expects to file its Annual Report on Form 10-K for the year ended December 31, 2018 on or before April 1, 2019. [Emphasis not added]

68.     A close reading and analysis of Nova's March 29, 2019 press release and related subsequent Nova public filings reveals:

(a)     Nova does not identify the independent auditors (the company and/or the persons acting on behalf of that company) it engaged to perform "special procedures";

(b)     Nova does not identify the customers by name that were subjected to the auditor's "special procedures";

(c)     Although Nova acknowledged that its public reporting of sales to Merlino Lewis LLP and Shanxi Wanqing ". . . did not state the accurate names of those entities…" Nova did not correct the names of these customers in its press release, its subsequently filed 2018 10-K;

(d)     Although Nova states that its ". . . independent auditor has reported to the Audit Committee…", Nova does not state whether that report was in writing;

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

(e)    The referenced independent auditor report was not referenced in or attached to Nova's subsequently filed 2018 10-K;

(f)    Nova's press release does not clarify or address its purported strategic alliance agreement, or any agreement, with Shanxi Wanqing;

(g)    Nova's press release does not respond in any form or fashion to the other red flags and concerns raised in the Andri Capital report relating to and including Nova's auditor, shareholder concerns, Diamond Bar, and its accounts receivable.

69.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, the Company has suffered significant losses and damages.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

70.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

71.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

72.    Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.   Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

73.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants and/or the former directors.   Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

74.    The Company Board is currently comprised of five (5) members – Lam, Su, Liu, La, and Patel.   Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, three (3) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

75.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

76.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

77.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

78.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

79.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

80.   Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## The Director Defendants Are Not Independent or Disinterested

**Defendant Lam**

81.   Defendant Lam is not disinterested or independent, and therefore, is incapable of considering demand because she (as its president and CEO) is an employee of the Company who derives substantially all her income from her employment with Nova making her not independent.  As such, Defendant Lam cannot independently consider any demand to sue herself for breaching her fiduciary duties to Nova, because that would expose her to liability and threaten her livelihood.

82.   Additionally, Nova acknowledges that Lam is not independent in its 2019 Proxy.

**Defendant Su**

83.   Defendant Su is not disinterested or independent, and therefore, is incapable of considering demand because she (as the Company's corporate secretary) is an employee of the Company who derives substantially all her income from her employment with Nova making her not independent.  As such, Defendant Su cannot independently consider any demand to sue herself for breaching her

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

fiduciary duties to Nova, because that would expose her to liability and threaten her livelihood.

84.    Additionally, Nova acknowledges that Su is not independent in its 2019 Proxy.

**Defendant Liu**

85.    Defendant Liu has served as a member of Nova's Board since May 19, 2015.  Since joining the Board, Liu has been the chairman of Nova's Audit Committee and a member of its Compensation Committee and Nominating and Governance Committee.

86.    Pursuant to the Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, assuring the adequacy and effectiveness of Nova's accounting, financial reporting and disclosure processes and adequacy of systems of disclosure and internal controls, ensure ethical compliance, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

87.    Defendant Liu breached his fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

place regarding the serious business reporting issues and deficiencies described above.

88.    Additionally, Liu signed and therefore personally made the false and misleading statements in, the 2016 10-K and 2017 10-K.

89.    Based on the foregoing and as further alleged herein, Defendant Liu faces a substantial likelihood of liability and any demand upon him is futile.

**Defendants La and Patel**

90.    Defendant La has served as a member of Nova's Board since January 24, 2017.  Since on or about that date, La has been a member of Nova's Audit Committee, Compensation Committee, and Nominating and Governance Committee.

91.    Defendant Patel has served as a member of Nova's Board since October 7, 2016.  Since on or about that date, Patel has been a member of Nova's Audit Committee, Compensation Committee, and Nominating and Governance Committee.

92.    Pursuant to the Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, assuring the adequacy and effectiveness of Nova's accounting, financial reporting and disclosure processes and adequacy of systems of disclosure and internal controls, ensure ethical compliance, and

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

93.    Defendants La and Patel breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.

94.    Additionally, Defendants La and Patel signed and therefore personally made the false and misleading statements in, the 2016 10-K and 2017 10-K.

95.    Based on the foregoing and as further alleged herein, Defendants La and Patel face a substantial likelihood of liability and any demand upon them is futile.

## IN REPURCHASING STOCK, NOVA RELIED ON THE OFFICER DEFENDANTS' FALSE OR MISLEADING STATEMENTS

96.    In purchasing common stock in connection with the stock repurchase program, Nova relied on the Officer Defendants' false or misleading statements, either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Co. v. Erica P. John Fund, Inc.*, 134 S. Ct.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

2398 (2014), or through the doctrine articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

97.    Throughout the Relevant Period, Nova justifiably expected the Officer Defendants to disclose material information as required by law and SEC regulations in the Company's periodic filings with the SEC and in statements made to the investing public.    Nova would not have purchased its securities at artificially inflated prices had the Officer Defendants disclosed all material information known to them or that was so obvious it should have been known to them, as detailed herein. Thus, reliance by Nova should be presumed with respect to the Officer Defendants' omissions of material information as established by the *Affiliated Ute* presumption of reliance.

98.    Additionally, the "fraud on the market" presumption applies to the Officer Defendants' misstatements of material facts or failures to disclose material facts.

99.    At all relevant times, the market for Nova stock was efficient market for the following reasons, among others:

(a)    Nova stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Nova filed periodic public reports with the SEC and the NASDAQ;

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

(c)     Nova regularly and publicly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)     Nova was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).   Each of these reports was publicly available and entered the public marketplace; and

(e)     The market price of Nova's stock reacted rapidly to new information entering the market.

100.   As a result of the foregoing, the market for Nova stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Nova's common stock. The foregoing facts indicate the existence of an efficient market for trading of Nova's stock and support application of the fraud-on-the-market doctrine.

101.   Nova relied on the integrity of the market price for the repurchase of its common stock and is entitled to a presumption of reliance with respect to the Officer Defendants' misstatements and omissions alleged herein.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

102.   Had Nova known of the material adverse information not disclosed by the Officer Defendants or been aware of the truth behind the Officer Defendants' material misstatements, the Company would not have purchased Nova stock at artificially inflated prices.

**NEITHER THE STATUTORY "SAFE HARBOR" NOR THE "BESPEAKS CAUTION" DOCTRINE APPLIES TO THE OFFICER DEFENDANTS' MISREPRESENTATIONS**

103.   Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA") nor the judicially created "bespeaks caution" doctrine applicable to forward looking statements under certain circumstances applies to any of the false or misleading statements pleaded herein. None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about (a) Nova's purported "strategic alliance" with Shanxi Wanginq to operate as lead designer and manufacturer for all furnishings in Shanxi Wanginq's planned $460 million senior care center in China and (b) Nova's inflated reported sales in 2016 and 2017 with Shanxi Wangqing and Merlino Lewis LLP.

104.   Alternatively, to the extent any of the false or misleading statements pleaded herein could be construed as forward-looking statements, they were not

accompanied by any meaningful cautionary language identifying important fact that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Further, to the extent the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded herein, the Officer Defendants are liable for those false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of Nova or an Officer Defendant who knew that the statement was materially false or misleading when made.  None of the historic or present tense statements made by the Officer Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Officer Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## COUNT I

### Against the Director Defendants for Breach of Fiduciary Duty

105.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

106.    The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

107.    The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

108.    The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the existence of a strategic alliance agreement and  the Company's publicly reported business performance, and failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls as alleged herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

109.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

110.    As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### Against the Director Defendants for Gross Mismanagement

111.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.  By their actions alleged herein, the Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

113.  As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of millions of dollars.

114.  Because of the misconduct and breaches of duty alleged herein, the Director Defendants are liable to the Company.

## COUNT III

### Against the Director Defendants for Waste of Corporate Assets

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

115.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.   The wrongful conduct alleged regarding the issuance of false and misleading statements and its failure to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

117.   As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers and (ii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

118.   As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

119.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT IV

### Derivative Claim For Violations Of Section 10(b) Of The Exchange Act And SEC Rule 10b-5 Promulgated Thereunder (Against All Defendants)

120.   Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

121.   This Count is asserted on behalf of the Company against the Officer Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

122.   During the Relevant Period, in connection with Nova's repurchases of Nova shares, the Officer Defendants made, disseminated, or approved false or misleading statements about Nova specified herein, which they knew or deliberately disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and the Officer Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

123.   At the same time that the price of the Company's common stock was inflated due to the false and misleading statements made by the Officer Defendants, the Officer Defendants caused the Company to repurchase millions of shares of its own stock at prices that were artificially inflated due to the Officer Defendants' false or misleading statements.  The Officer Defendants engaged in a scheme to defraud Nova by causing the Company to purchase Nova shares at inflated prices.

124.   The Officer Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Nova in connection with the Company's purchases of Nova common stock during the Relevant Period.

125.    The Officer Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made or disseminated various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made or disseminated, in light of the circumstances under which they were made or disseminated, not misleading; made or disseminated the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in connection with the Company's purchase of Nova common stock, which were intended to, and did (a) deceive Nova regarding, among other things, (i) Nova's purported "strategic alliance" with Shanxi Wanginq to operate as lead designer and manufacturer for all furnishings in Shanxi Wanginq's planned $460 million senior care center in China and (ii) Nova's inflated reported sales in 2016 and 2017 with Shanxi Wangqing and Merlino Lewis LLP; (b) artificially inflate and maintain the market price of Nova stock; and (c) cause Nova to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known.    Throughout the

Relevant Period, Defendants were in possession of material, adverse non-public information regarding the Company's cloud revenues and growth.

126.   The Officer Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the Relevant Period, as alleged above.

127.   As described above, the Officer Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth herein were either known to the Officer Defendants or were so that the Officer Defendants should have been aware of them.

128.   As a result of the Officer Defendants' misconduct, Nova has suffered damages in that it paid artificially inflated prices for Nova common stock as part of the repurchase program and suffered losses when the true facts became known. Nova would not have purchased Nova common stock at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Officer Defendants' false or misleading statements.

129.   As a direct and proximate result of the Officer Defendants' wrongful conduct, the Company suffered damages in connection with its repurchases of Nova common stock during the Relevant Period.  By reason of such conduct, the Officer

Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

130.   Plaintiff brought this claim within two years of its discovery of the facts constituting the violation and within five years of the violation.

### COUNT V

### Derivative Claim For Violations of Section 20(a) of the Exchange Act (Against Defendant Lam)

131.   Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

132.   This Count is asserted on behalf of the Company against Defendant Lam for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

133.   During her tenure as an officer and/or Chairman of the Board, Defendant Lam was a controlling person of all Officer Defendants within the meaning of Section 20(a) of the Exchange Act.  By reason of her absolute control, Defendant Lam had the power and authority to direct the management and activities of the other Officer Defendants, to hire and fire the other Officer Defendants at whim, and to cause the other Officer Defendants to engage in the wrongful conduct complained of herein.  Defendant Lam was able to and did control, directly or indirectly, the content of the public statements made by all other Officer Defendants during the Relevant Period, including the materially misleading financial statements,

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

134.    In her capacity as senior executive, and Chairman of the Board of Nova, Defendant Lam had direct involvement in and oversight over the day-to-day operations of the Officer Defendants and the Company's employees, who would not act unless Defendant Lam agreed with their course of conduct.

135.    Defendant Lam, individually, was a controlling person of the other Officer Defendants within the meaning of Section 20(a) of the Exchange Act.

136.    As set forth above, all Officer Defendants violated Section 10(b) of the Exchange Act by their acts and omissions as alleged herein.    To the extent Defendant Lam is not the maker or disseminator of a specific false or misleading statement made by the other Officer Defendants, or lacked ultimate authority over such statement made by the other Officer Defendants, Defendant Lam is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally, with, and to the same extent as, the other Officer Defendants are liable under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder to the Company in connection with its purchases of Nova common stock pursuant to the Company's stock repurchase program. As detailed above, during the Relevant Period, Defendant Lam was culpable for the material misstatements made by the other Officer Defendants.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

137.   As a direct and proximate result of Defendant Lam's conduct, the Company suffered damages in connection with its purchase of Nova common stock pursuant to the stock repurchase program.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)   Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

(B)   Finding the Director Defendants liable for breaching their fiduciary duties owed to the Company;

(C)   Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)   Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(E)   Awarding such other and further relief as is just and equitable.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: May 15, 2019

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15  Of Counsel:

16

17

18

19

20

21

22

23

24

25

26

27

28

**TOSTRUD LAW GROUP, P.C.**

By: */s/ Jon A. Tostrud*
   Jon A. Tostrud
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 278-2600
Facsimile: (310) 278-2640
jtostrud@tostrudlaw.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***

**MOORE KUEHN, PLLC**
Fletcher Moore, Esq.
30 Wall Street, 8th Floor
New York, NY 10005

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **<u>VERIFICATION</u>**

I, WILTON SAMUELS, declare that I have reviewed the Verified Shareholder Amended Derivative Complaint ("Complaint") prepared on behalf of Nova Lifestyle, Inc. and authorize its filing.  I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.  I further declare that I am a current holder, and have been a holder, of Nova Lifestyle, Inc. common stock at all relevant times.

*Wilton Samuels*

WILTON SAMUELS